**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA** *for the use and benefit of* **ACK MARINE & GENERAL CONTRACTING, LLC,**<br><br>　　　　**Plaintiff,**<br><br>　　v.<br><br>**WALSH FEDERAL, LLC and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,**<br><br>　　　　**Defendants.** | **Civil Action No. 24-10537-BEM** |
| **WALSH FEDERAL, LLC,**<br><br>　　　　**Third-Party Plaintiff,**<br><br>　　v.<br><br>**COLLINS ENGINEERS, INC. and FRANKENMUTH MUTUAL INSURANCE CO.,**<br><br>　　　　**Third-Party Defendants.** | |

**MEMORANDUM AND ORDER ON**
**THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MURPHY, J.**

This action arose out of a federal contract between Walsh Federal, LLC ("Walsh") and the United States Coast Guard. A subcontractor, ACK Marine and General Contracting, LLC ("ACK"), brought a suit against Walsh and Travelers Casualty and Surety Company of America ("Travelers"), which had issued a payment bond with Walsh as principal. Walsh subsequently filed a third-party complaint against Frankenmuth Mutual Ins. Co. ("Frankenmuth"), which had

issued a performance bond with ACK as principal, and Collins Engineers, Inc.  In response, Frankenmuth moved for summary judgment.  For the reasons set forth below, that motion will be granted.

## I.    Background

### A.    Factual Background

In May of 2021, Walsh entered into a design-build contract with the United States Coast Guard.  Dkt. 46 ("Statement of Material Facts" or "SMF") ¶ 1.[1]  On or about June 28, 2021, Walsh entered into a subcontract (the "Subcontract") with ACK.  *Id.* ¶ 2.  On or about June 24, 2021, Frankenmuth, as surety, issued a performance bond (the "Performance Bond") naming ACK as Principal and Walsh as Obligee.  *Id.* ¶ 3.  The Performance Bond states, in relevant part, that "[w]henever [Walsh] has declared [ACK] to be IN DEFAULT OF THE CONTRACT," Frankenmuth's obligations as surety are triggered.  Dkt. 45 at 84–85.

In June and July of 2023, Walsh sent a series of letters and emails to ACK and Frankenmuth raising concerns about ACK's performance under the Subcontract.  On June 2, 2023, Walsh sent a letter to ACK stating, inter alia:

> There is currently no dedicated ACK crew to perform this work and *ACK is in breach of their Subcontract Agreement* by failing to provide proper manpower. Walsh expects ACK to have a crew present and working on pile cap grouting on Monday, June 12, 2023.  If that does not occur, then Walsh reserves the right to move forward supplementing ACK's crew and back charge ACK accordingly.

Dkt. 49 at 90 (emphasis added).  On July 3, 2023, Walsh sent a similar letter stating that "ACK's actions are in breach of ACK's subcontract" and,

> To the extent that ACK has not cured this breach . . . by July 9, 2023, then Walsh will take all necessary action to mitigate the impacts to the Project schedule caused by ACK's actions or inactions, including but not limited to, supplementing ACK's

---

[1] The Court cites to Frankenmuth's statements of material facts where Walsh has admitted or otherwise adopted the relevant facts in its own statement of material facts.

workforce and back charging ACK's accordingly.  ACK will be responsible for any resulting damages from its breach.

Dkt. 45 at 92.  Finally, on July 6, 2023, Walsh emailed Frankenmuth stating that, "*[i]f ACK fails to cure their default*, we will be seeking to supplement ACK's forces on Monday.  In addition to providing you notice, we would appreciate if you could call ACK and tell them that they need to continue to perform." *Id.* at 94.  Frankenmuth responded the next day: "We have contacted ACK . . . to discuss Walsh's position that it is in breach and will contact you with an update."  Dkt. 49 at 131.  ACK substantially completed its work in October 2023.  SMF ¶ 6.[2]

### B.    Procedural Background

On March 4, 2024, ACK brought suit against Walsh alleging breach of contract, quantum meruit, and a violation of Mass. Gen. Laws ch. 93A, and against Travelers for a claim against the payment bond Travelers issued with Walsh as principal.  Dkt. 1 at 9–12.  Walsh, in turn, filed a third-party complaint against Collins Engineers alleging breach of contract, quantum meruit, and negligence, and a claim against the performance bond Frankenmuth issued with ACK as principal. Dkt. 12 at 5–8.  On December 23, 2025, Frankenmuth moved for summary judgment on the grounds that Walsh failed to issue the requisite notice of default and that Walsh sought no damages that might be recoverable from Frankenmuth.  Dkts. 43–44.  The Court held a hearing on February 12, 2026, and took the motion under advisement.

## II.    Legal Standard

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no

---

[2] Walsh did not respond to this fact in its own Statement of Material Facts.  *See generally* Dkt. 48. Accordingly, the Court treats this fact as undisputed.  *See* Local Rule 56.1; *Silva v. Town of Uxbridge*, 771 F. Supp. 3d 56, 65 (D. Mass. 2025) ("The nonmovant 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986))).

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position."  *Grogan*, 552 F. Supp. 3d at 145 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)).

The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). However, "[t]he nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that *every essential element* of its claim or defense is at least trialworthy."  *Price v. Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991) (emphasis in original).  "Where the non-moving party bears the ultimate burden of proof, the non-moving party 'must present definite, competent evidence to rebut the motion.'"  *Satanic Temple, Inc. v. City of Bos.*, 684 F. Supp. 3d 21, 30 (D. Mass. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)), *aff'd*, 111 F.4th 156 (1st Cir. 2024).

### III.    Discussion

Frankenmuth argues that it is entitled to summary judgment—and thereby, to be dismissed as a third-party defendant—because its obligations were never triggered under the Performance Bond.  Dkt. 44 at 7.  More specifically, Frankenmuth contends that none of Walsh's communications regarding ACK's performance constituted an unambiguous declaration of default.  *Id.*  Walsh argues that it did declare ACK in default and that, in any event, Frankenmuth

4

waived notice defenses because the Subcontract provides that Frankenmuth "will not use lack of notice from [Walsh] as a defense to any claim by [Walsh] on [ACK's] bond." Dkt. 47 at 7–8.

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court," but, "if the contract's terms are ambiguous, contract meaning normally becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary."[3] *Bank v. Int'l Bus. Machines Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) (cleaned up). Here "[n]either party claims that the language of the performance bond is ambiguous; each insists that the plain language of the bond supports its position." *Arch Ins. Co. v. Graphic Builders LLC*, 36 F.4th 12, 17 (1st Cir. 2022). "[H]ence, [the court's] task is to interpret [the bond] according to its plain terms." *Id.* (internal quotation marks omitted); *see also Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004) ("Ambiguity is not created merely because the litigants disagree about the meaning of a contract.").

### A.    <u>Waiver of Notice Defenses</u>

The Court turns first to Walsh's waiver argument. The Subcontract states, in relevant part:

> [ACK] is obligated under this Agreement to provide [Frankenmuth] with all notices, letters, or email, from [Walsh] relating to deficiencies, or alleged deficiencies, in [ACK's] performance of this Agreement, and [Frankenmuth] agrees that if [ACK] fails to provide [Frankenmuth] with such information, [Frankenmuth] will not use lack of notice from [Walsh] as a defense to any claim by [Walsh] on [ACK's] bond.

---

[3] The Subcontract, which the Performance Bond incorporates by reference, states that "[t]his Agreement shall be governed by the law of the state . . . in which the Project is situated." Dkt. 49 at 19 ¶ 11.1. That state is Massachusetts. *Id.* at 5.

Dkt. 49 at 14 ¶ 7.14.    Under Massachusetts law, "[i]f a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment." *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002).

The clause upon which Walsh relies—"[Frankenmuth] agrees that if [ACK] fails to provide [Frankenmuth] with such information, [Frankenmuth] will not use lack of notice from [Walsh] as a defense"—is modified by the preceding clause, which narrows its scope.  Dkt. 49 at 14 ¶ 7.14. That is, Frankenmuth agrees only to not to use lack of notice from Walsh as a defense, "if [ACK] fails to provide [Frankenmuth] with such information." *Id.*  This interpretation is further supported by the first half of the sentence, which enumerates ACK's obligations to notify Frankenmuth of ACK's default: "[ACK] is obligated under this Agreement to provide [Frankenmuth] with all notices, letters, or email, from [Walsh] relating to deficiencies, or alleged deficiencies, in [ACK's] performance of this Agreement." *Id.*  Read together, this provision is clearly intended to obligate ACK to communicate to its surety, Frankenmuth, when ACK is in default, and to protect Walsh should ACK fail to do so.  This provision does not insulate Walsh in the event Walsh itself fails to adequately declare ACK in default at all, to anyone, which is precisely what Frankenmuth alleges here.

## B.    Declaration of Default

Having determined that Frankenmuth did not waive its argument related to Walsh's alleged failure to declare ACK in default, the Court turns next to that argument.  "[A] declaration of default sufficient to invoke the surety's obligations . . . must be made in clear, direct, and unequivocal language." *Seaboard Sur. Co. v. Town of Greenfield ex rel. Greenfield Middle Sch. Bldg. Comm.*, 370 F.3d 215, 223 (1st Cir. 2004) (ellipsis in original) (citation omitted); *see also L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 110 (5th Cir. 1994) (concluding a "communication that [made] it clear that [a subcontractor] failed to fulfill a contract or duty" does

6

not "constitute[] a legal declaration of default" because that "impermissibly blurs the distinct concepts of 'breach' and 'default'" (first and third alterations in original)).  Courts have concluded that notice of default is insufficient when letters do not mention the word "default" or merely complain about performance, financial status, or delays in performance.  *See Seaboard*, 370 F.3d at 223 (collecting cases).  The Fifth Circuit has explained, helpfully, that:

> Serious legal consequences attend a "declaration of default", particularly in cases . . . involving multi-million-dollar construction projects.  Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals.  *After a declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee*.  Given the consequences that follow a declaration of default, *it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing* under the terms of its bond.  Sureties deprived of a clear rule for notices of default would be reluctant to enter into otherwise profitable contracts.

*L & A Contracting Co.*, 17 F.3d at 111 (emphases added and footnotes omitted).

Here, Walsh's communications to ACK and to Frankenmuth make abundantly clear that Walsh was dissatisfied with ACK's performance of its obligations and that, in Walsh's view, ACK was in breach.[4]  *See* Dkt. 49 at 90 ("ACK is in *breach* of their Subcontract Agreement by failing to provide proper manpower." (emphasis added)); Dkt. 45 at 92 ("ACK's actions are in *breach* of ACK's subcontract agreement." (emphasis added)).  However, "breach" and "default" are not synonymous for the purpose of declaring default.  *See L & A Contracting Co.*, 17 F.3d at 110 ("Although the terms 'breach' and 'default' are sometimes used interchangeably, their meanings are distinct in construction suretyship law.  Not every breach of a construction contract constitutes

---

[4] It is not clear from the record whether Frankenmuth received the June 2 letter Walsh sent to ACK. However, the Subcontract prohibits Frankenmuth from raising as a defense lack of notice that resulted from ACK's failure to pass along notices of default from Walsh.  *See supra* Section III.1.  Accordingly, the Court will consider all documents Walsh provided to ACK when determining whether Walsh declared ACK in default.

a default sufficient to require the surety to step in and remedy it." (footnote omitted)). Furthermore, in these same communications, Walsh makes clear that it expects ACK to come back in compliance and expressly reserves the right to take additional, future action if that does not occur. *See, e.g.*, Dkt. 49 at 90 ("Walsh expects ACK to have a crew present and working on pile cap grouting on Monday, June 12, 2023. *If that does not occur, then Walsh reserves the right to move forward supplementing ACK's crew* and back charge ACK accordingly." (emphasis added)); Dkt. 45 at 92 ("To the extent that *ACK has not cured this breach* by supplying the appropriate manpower to maintain the Project schedule by July 9, 2023, *then Walsh will take all necessary action to mitigate the impacts to the Project schedule*." (emphases added)). Even in the sole communication in which Walsh uses the term "default," Walsh suggests that the "default" is curable if ACK supplements its work crew and continues to perform, rather than a permanent, relationship-altering status. *See* Dkt. 45 at 94 ("*If ACK fails to cure their default*, we will be seeking to supplement ACK's forces on Monday. In addition to providing you notice, we would appreciate if you could call ACK and tell them that *they need to continue to perform*." (emphases added)); *see also Gilbane Bldg. Co. v. Universal Fire Sprinklers Co.*, 2017 WL 11641459, at *2 (D.P.R. July 27, 2017) (giving the subcontractor 48 hours after receiving a notice to cure the breaches before the contractor "declared [the subcontractor] in default, terminated [the subcontractor's] right to perform the subcontract, and demanded that [the surety] fulfill its obligations").

These communications, which contemplate the opportunity for ACK to cure its breach or default, do not constitute "clear, direct, and unequivocal language" triggering a "dramatic[]" relationship change between the parties and significant, *immediate* obligations for Frankenmuth. *L & A Contracting Co.*, 17 F.3d at 111; *see also Gilbane Bldg.*, 2017 WL 11641459, at *2. Walsh

emphasizes in its opposition that, in response to the July 6 email, Frankenmuth states "We have contacted [ACK] to discuss Walsh's position that it is in breach and will contact you with an update," as evidence that Frankenmuth was on notice of the default.  Dkt. 47 at 7.  But this could just as easily suggest that Frankenmuth did *not* understand ACK to be in default or to itself have any immediate obligations under the Performance Bond and was merely taking steps to avoid its principal's being declared in default.[5]  *See* Dkt. 45 at 84–85 (directing that, "whenever [Walsh] has declared [ACK] to be IN DEFAULT," Frankenmuth must either complete the contract work itself or through contractors, tender the penal sum of the bond to Walsh, deny its liability after an independent investigation, or reimburse Walsh should Walsh decide to immediately perform ACK's contract obligations itself).  In sum, Walsh's communications are more appropriately characterized as notices to cure, and do not constitute "clear, direct, and unequivocal" language declaring ACK in default.  *Seaboard*, 370 F.3d at 223.  Accordingly, Frankenmuth is entitled to summary judgment.

### C.    Damages

Because Walsh failed to declare ACK in default, the Court need not address the parties' arguments as to damages.

## IV.    Conclusion

For the foregoing reasons, Frankenmuth's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  March 10, 2026                Judge, United States District Court

---

[5] The Performance Bond does provide, however, that upon a declaration of default, one of Frankenmuth's options is to make "an independent investigation" into the "alleged default" and then to "deny its liability in whole or in party."  Dkt. 45 at 85.